IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JEFFREY K. ARMSTRONG, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 1:11-cr-304 (GBL) |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Petitioner Jeffrey K. Armstrong's ("Petitioner") Petition to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255 (2012). (Doc. 107.) This case concerns the constitutionality of Petitioner's conviction of wire fraud following a four-day jury trial in this Court. Specifically, Petitioner contends that his counsel provided constitutionally ineffective assistance by failing to move for judgment of acquittal, by failing to further develop the legitimacy of Petitioner's shoulder injury, and by failing to pursue various strategic trial procedures.

The issue before the Court is whether Petitioner received constitutionally effective assistance of counsel under 28 U.S.C. § 2255, where counsel's failure to pursue a motion for a judgment of acquittal and failure to pursue a trial strategy further developing the legitimacy of Petitioner's medical condition were objectively reasonable and did not work to Petitioner's actual and substantial disadvantage. The Court holds that Petitioner's counsel rendered constitutionally effective assistance because a more thorough vetting of the relevance of Petitioner's legitimate injury could not have undermined the evidence that Petitioner devised and executed a scheme to defraud the UN and the NLRB to conceal his dual employment by making

materially false representations and omissions. Additionally, under the highly deferential *Strickland* standard, counsel's trial strategy was objectively reasonable and could not have worked to Petitioner's actual and substantial disadvantage.

## I. BACKGROUND AND PROCEDURAL HISTORY

In March 2008, Armstrong took leave from his position with the United States Department of the Army and began a two-year assignment with the United Nations ("UN") in New York as the Assistant Chief of Special Operations. (Trial Tr. vol. 2, 85; 103-08.) As Assistant Chief, Armstrong's position required that he oversee various security functions and personnel and compensated him at approximately $160,000 per annum. (*Id.* at 139; Trial Tr. vol. 1, 32; Trial Tr. vol. 2A, 139.) After approximately eleven months of employment with the UN, on February 18, 2009, Armstrong applied for a position as head of security for the NLRB in Washington, D.C. (GX-4.) Armstrong told the NLRB that his contract with the UN was ending but requested that they not contact his current supervisor, Bruno Henn, for fear that it would make it difficult for another American to fill the position. (Trial Tr. vol. 1, 33-34, 57.) The NLRB extended Armstrong a job offer on March 29, 2009, which he accepted the same day. (Trial Tr. vol. 2, 82.) In completing his employment forms with the NLRB, Armstrong made several omissions related to his employment with the UN. (Trial Tr. vol. 1, 65-67; GX-9-006; GX-14-005, 007.) Armstrong began his employment as head of the NLRB's security branch on April 13, 2009, with compensation of $120,830 per annum. (Trial Tr. vol. 1, 60.) Neither of Armstrong's employers was aware that Armstrong possessed concurrent full-time employment beginning April 2009. (*Id.* at 33-34; Trial Tr. vol. 1A, 129.)

Shortly after accepting his second full-time position at the NLRB, on April 1, 2009, Armstrong submitted his initial request for extended sick leave from the UN. (GX-28-A.) The

2

UN's internal approval process required that Armstrong submit a note from a doctor in order to receive approval for the first twenty days' sick leave. (Trial Tr. vol. 2, 100-01; Trial Tr. vol. 2A, 117, 152.) Armstrong submitted a note from Dr. Hayashi stating that Armstrong suffered from chronic shoulder problems which had been exacerbated by work and which resulted in a diagnosis of "right shoulder suraspinatus tendinosis versus tendinitis." (Trial Tr. vol. 2A, 154-57.) This diagnosis required four weeks of intensive physical therapy, and Armstrong's leave beginning April 3, 2009, was certified by the UN. (GX-29-B.) Beyond this initial twenty-day leave period, subsequent sick leave requests would require certification and approval from the UN Medical Services Division case officer in order to ascertain the existence of a clear diagnosis, the adequacy and reasonableness of the treatment, and to ensure a plan was in place to return the employee to work. (Trial Tr. vol. 2, 100-01.)

On May 13, 2009, the UN notified Armstrong that because no additional sick leave justification had been received, his leave period ended on May 1, 2009, and additional absences would accrue against his annual leave and result in the withholding of his salary. (GX-28-E-007.) Armstrong sought to extend his sick leave period from May 1, 2009 through August 1, 2009, by faxing a UN sick leave form signed by Dr. Williams, a letter from Dr. Williams containing substantially similar language to the first letter from Dr. Hayashi, and a note from Armstrong stating "[m]y doctor would not include this [medication information] within the doctor's note due to legal reasons." (*Id.* at 001.) Evidence suggested that Armstrong authored the sick leave form because a partially-completed form was recovered on Armstrong's NLRB computer, and Armstrong's UN subordinate emailed him a blank form earlier that same day at Armstrong's request. (Trial Tr. vol. 2, 50-51; GX-16.)

3

The UN case officer, Dr. Ojeda, denied Armstrong's request because the sick leave period had gone beyond the expected leave for the diagnosis and requested more detailed and specific information. (GX- 28-G, Ex. 1.) Within forty-five minutes of receiving Ojeda's email denial, Armstrong left the NLRB in Washington D.C., went to Reagan National Airport, purchased a plane ticket, and flew to New York. (Trial Tr. vol. 3, 34; GX-51.) Thirty minutes after his flight's arrival, Armstrong entered the UN complex and went to Dr. Ojeda's office to confront her about the denial. (Trial Tr. vol. 3, 37; GX-63-007.) Dr. Ojeda documented that Armstrong was very upset and stated that he would not "provide additional information for legal reasons." (GX-28-G.) Over the next several weeks, Armstrong would make multiple submissions to the UN including, among other documents, an unsigned version of the sick form submitted on May 13, 2009, despite Dr. Williams having no knowledge that this document had been submitted bearing her name without signature, and emails claiming Dr. Williams would not respond to the list of requirements requested by the UN. (GX-28-I; Trial Tr. vol. 2A, 190; Trial Tr. Vol. 2A, 199-200; GX-28-J-003.) On July 3, 2009, Armstrong submitted yet another sick leave form, this time signed by Dr. Williams and accompanied by a MRI of his shoulder, in response to which the UN certified his sick leave for the period May through July 2009. (Trial Tr. Vol. 2A, 178.)

Armstrong's injury required surgery that he scheduled for August 19, 2009 in Virginia. The day before surgery, on August 18, 2009, Armstrong submitted one final sick leave form signed by Dr. Williams in which he indicated the scheduling of this surgery. (GX-28-L; Trial Tr. vol. 2A, 195-97.) Following this surgery, the UN approved Armstrong's continued leave through September 29, 2009. (GX-29-D; Trial Tr. vol. 3, 56.)

4

The deterioration of Armstrong's scheme began September 9, 2009, when the NLRB received a letter, purportedly from the UN, requesting the NLRB allow Armstrong to return to the UN in order to participate in the upcoming General Assembly. Although the letter bore the name of Armstrong's friend and subordinate, Yeon Adams, Adams neither authored nor signed this letter, and Armstrong admitted during trial that he had forged Adams's signature. (Trial Tr. vol. 2, 52; GX-40-003.) Adams had addressed the letter for Armstrong because Armstrong stated he was having trouble addressing the envelope due to his arm being in a sling. (Trial Tr. vol. 2, 60-61.) However, Adams did not become aware of his involvement or that the letter forged his name until confronted by a UN investigator. (Trial Tr. vol. 2, 52; GX-40-003.) Armstrong's NLRB supervisors ultimately decided not to permit Armstrong to participate in the UN. (Trial Tr. vol. 1A, 88.)

On September 28, 2009, in response to Armstrong's performance at the UN, the NLRB contacted Armstrong's manager at the UN, Bruno Henn, to seek guidance. (Trial Tr. vol. 1A, 93-94.) During this conversation, Armstrong's managers discovered that Armstrong was a full-time employee at both the UN and the NLRB, and both agencies immediately placed Armstrong on administrative leave. (*Id.* at 95, 106, 129.) In order to maintain his concurrent full-time employment, Armstrong took advantage of the UN's sick leave policy from April 3, 2009 through September 28, 2009, and received approximately $65,000 in compensation from the UN and approximately $40,000 in compensation from the NLRB. (GX-40.) During the UN's internal investigation, Armstrong claimed that he had tendered his verbal resignation in March and April 2009 notwithstanding his continued efforts to obtain sick leave approval throughout this period. (Trial Tr. vol 2A, 213, 215.)

By final judgment entered January 21, 2012, following a jury trial, Armstrong was convicted of nine counts of wire fraud in violation of 18 U.S.C. § 1343. The Court sentenced Armstrong to 18 months in prison and ordered to pay restitution in the amount of $129,153.19. Armstrong subsequently appealed his conviction to the Fourth Circuit which recently affirmed his conviction on all counts. *See United States v. Armstrong*, 494 F. App'x 297 (4th Cir. 2012).

## II. STANDARD OF REVIEW

A motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 allows a prisoner to challenge the legality of the sentence on four grounds: (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose [] sentence," (3) "the sentence was in excess of the maximum authorized by law," or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The prisoner bears the burden to demonstrate by a preponderance of the evidence that grounds for relief exist. *See Hall v. United States*, 30 F. Supp. 2d 883, 889 (E.D. Va. 1998) (citing *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967)).

A motion brought under 28 U.S.C. § 2255 is meant to remedy fundamental errors, and is reserved for situations where failing to grant relief would "result[] in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill v. United States*, 386 U.S. 424, 428 (1962)). A motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 may not be brought as a substitute to appeal; waived claims are procedurally defaulted absent a showing of cause and actual prejudice. *United States v. Frady*, 456 U.S. 152 165-67 (1982). However, an exception applies for a claim of constitutionally ineffective assistance of counsel claim. *See United States v. Martinez*, 136 F.3d 972, 979 (4th Cir. 1998). A claim of ineffective assistance of counsel may be brought "in three ways: (1) in a motion for a new trial

based on anything other than newly discovered evidence; (2) no direct appeal if and only if is conclusively appears from the record that his counsel did not provide effective assistance; or (3) by a collateral challenge pursuant to 28 U.S.C. § 2255." *Id.*

### III. DISCUSSION

The Court denies Petitioner's Motion to Vacate, Set Aside, or Correct Sentence for three reasons. First, Petitioner's claim that he received constitutionally ineffective assistance because counsel failed to move for judgment of acquittal fails both prongs of *Strickland* because Petitioner cannot show that the government's evidence, as a whole, was insufficient to support a jury verdict. Second, to the extent that Petitioner's claim of ineffective assistance of counsel relies upon the legitimacy of Petitioner's shoulder injury, Petitioner's argument misstates the trial proceedings and fails to establish prejudice in the face of the substantial additional evidence presented. Third, Petitioner's arguments that he received constitutionally ineffective assistance of counsel because counsel's trial strategy did not align with Petitioner's strategy cannot overcome the highly deferential standard given to counsel's performance.

Under the familiar standard for claims of ineffective assistance of counsel set forth by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." In order to prove defendant's counsel was deficient under the first prong of *Strickland*, "the petitioner must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "The performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," and under a highly deferential standard, "[t]he court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 689-90. The overarching

purpose of the court's inquiry is to ensure that the criminal defendant received a fair trial, and "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689-90; *see also Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000) (stating that a reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis"); *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994) (stating that a court must "presume that challenged acts are likely the result of sound trial strategy").

To satisfy the second prong of Strickland, that the defense was prejudiced by the deficient performance, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *accord, Lovitt v. True*, 403 F.3d 171, 181 (4th Cir. 2005). The petitioner carries the burden of establishing that counsel's trial errors created not merely the *possibility* of prejudice, but rather "that they worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (citing *Frady*, 456 U.S. at 170). The petitioner is required to show both deficient performance and actual prejudice. *Spencer*, 18 F.3d at 233 (citing *Strickland*, 466 U.S. at 687). The two prongs of the *Strickland* test are "separate and distinct elements of an ineffective assistance claim." *Id.*

Petitioner's first argument is that he was denied effective assistance of counsel when his counsel failed to move for judgment of acquittal because the government failed to establish a material element of their case. (Def.'s Mot. to Vac, 10-11 Doc 107.) Petitioner's position

generally is that, because his statements to the UN regarding his legitimate shoulder injury were not materially false, the government failed to establish a "scheme to defraud" pursuant to 18 U.S.C. § 1343. Thus, petitioner asserts that his counsel provided ineffective assistance by failing to move for judgment of acquittal, failing to investigate the leave forms by hiring a medical expert, improperly stipulating to the UN's medical files, failing to call Armstrong's case officer, Dr. Ojeda, as a witness, and failing to pursue the credibility of the UN Medical Services Division employees. As affirmed by the Fourth Circuit, "[i]n this Circuit, wire fraud under 18 U.S.C. § 1343 requires 'two essential elements: (1) the existence of a scheme to defraud and (2) the use of . . . wire communication in furtherance of the scheme.'" *Armstrong*, 494 F. App'x at 299 (quoting *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006)).

Petitioner's first argument is without merit. Evidence produced at trial indicated that false statements and omissions in the information submitted to his employer were the result of Petitioner's scheme to defraud. This evidence included Armstrong's completion of the sick leave forms, Armstrong's false statements to the UN about his inability to work due to illness, his doctor's unwillingness to provide additional information, and Armstrong's requests to the NLRB that they not contact his manager and instead contact his friend and subordinate. Armstrong bolstered his scheme with a forged letter to the NLRB requesting leave to return to the UN, and most importantly, his continued failure to disclose to his employers that he was concurrently employed. In the face of this overwhelming evidence, counsel's decision not to make a motion for acquittal fails both prongs of the *Strickland* test. A motion for acquittal would not only have made no difference in the outcome, but was an entirely reasonable decision by counsel given the overwhelming evidence Armstrong fails to consider in filing this motion.

Furthermore, Petitioner previously challenged the sufficiency of the evidence to support his conviction in his appeal to the Court of Appeals for the Fourth Circuit, and the Court there determined specifically that, "the record contains sufficient proof . . . that Armstrong devised and executed a scheme to defraud the UN and the NLRB and employed a multitude of materially false representations and omissions in order to succeed." *Armstrong*, 494 F. App'x at 299. As a result, Petitioner cannot show that his conviction would have been different had his counsel moved for judgment of acquittal at the close of the trial, and he cannot show that failure to do so was unreasonable, so his first claim is without merit.

Second, Armstrong's claims that he received ineffective assistance of counsel because the legitimacy of his shoulder injury should have been more fully vetted by counsel misstate the proceedings and fail to consider the totality of the evidence. Although the jurors may have questioned the legitimacy of Armstrong's injury based on evidence that he created the sick leave forms and made misrepresentations to the UN about his inability and his doctor's unwillingness to provide additional information, this did not constitute the totality of the evidence against him. Ultimately, the validity of Armstrong's injury and the accuracy of the information given to his employer do not undermine the most important evidence—that Armstrong failed to notify either employer that he was concurrently employed and continued working at the NLRB while he was on sick leave from the UN.

Counsel's failure to pursue the legitimacy of Armstrong's injury during trial could not have had a prejudicial effect on the outcome given the additional evidence of Armstrong's scheme. Most importantly, Armstrong fails to consider that it was his omissions, and not his assertions regarding his medical condition, that provided the most poignant evidence of his guilt. Furthermore, the government conceded to the jury that Armstrong's injury was legitimate, and at

no point during the trial was this contested. (*See, e.g.*, Trial Tr. vol. 4, 42 (government stated in its closing argument that "no one disputes that the defendant had legitimate shoulder problems or that he had a surgery in August"); Trial Tr. vol. 1, 43 (defense stated in its opening "one thing that's not at issue, so you understand it, his injuries were real . . . and he got legitimate medical certifications . . . . No one has ever questioned that he had a real bad shoulder").) Furthermore, Armstrong himself testified in open court about the legitimacy of his shoulder injury. (*See, e.g.*, Trial Tr. vol. 3, 125-26.)

Thus, while the accuracy of the information submitted by Armstrong to the UN was certainly relevant to the existence of a fraud scheme, this evidence was in no way dispositive to the outcome of the case. Armstrong's omissions to his employers were as important, if not more important to the jury's finding of Armstrong's scheme to defraud. Thus, counsel's failure to more fully develop the legitimacy of Petitioner's injury could not have had an actual and substantial disadvantage on the outcome of Petitioner's case.

Third, Petitioner's arguments that he received constitutionally ineffective assistance of counsel because counsel's trial strategy did not align with Petitioner's strategy cannot overcome the highly deferential standard given to counsel's performance. Judicial scrutiny of counsel's performance must be highly deferential because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Indeed, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

As discussed, the evidence of Armstrong's omissions was at least as important as the evidence of Armstrong's false statements. In the face of this overwhelming evidence of Armstrong's guilt, counsel's failure to pursue investigation related to accuracy of the sick leave form, to hire a physician as an expert witness, or to call Dr. Ojeda as a witness were entirely reasonable. Indeed, Dr. Ojeda testified not only that Armstrong "was crazy and mentally unstable," but that he was "the type of person who could use a gun to kill hundreds of people." (Br. 24-25.) Counsel's pursuit of Petitioner's recommended strategies would have been legally irrelevant to Armstrong's scheme and potentially harmful to the overall defense strategy. Thus, counsel's decisions to avoid certain trial strategies could not have had an actual and substantial disadvantage on Petitioner's case such that the assistance was constitutionally ineffective.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Petitioner Armstrong's Petition to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255. Petitioner has failed to demonstrate that counsel's performance fell below an objective level of reasonableness under *Strickland* and had any prejudicial effect on the outcome of Petitioner's case. Accordingly,

**IT IS HEREBY ORDERED** Petitioner Armstrong's Petition to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255 (Doc. 107) is **DENIED.**

**IT IS SO ORDERED.**

ENTERED this ___ day of August, 2013.

Alexandria, Virginia
8/__/2013

/s/
Gerald Bruce Lee
United States District Judge